of a class of subjects, in addition to those already named.

It is also urged that this is a penal statute, and therefore to be strictly construed. The rule as stated is admitted. But nothing more is meant by it than that such statutes shall not be extended, by what is known as equitable construction, to cases other than those which clearly appear to have been intended by the legislature, and are fairly included in the language used to express such intention. The intention, then, of the legislature is as proper a subject of inquiry for the court in the case of a penal statute as any other; and that intention when ascertained by applying the usual rules of construction is to govern in the one case as well as the other. The Enterprise [Case No. 4,-499]; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 95; American Fur Co. v. U. S., 2 Pet. [27 U. S.] 367; U. S. v. Winn [Case No. 16,740]; U. S. v. Morris, 14 Pet. [39 U. S.] 464.

In this case it is manifest that the legislature intended to prevent Indian lands from being used by white people as pasture grounds for their stock, without the consent of the Indians. It will not be denied that sheep are as much within the mischief to be remedied as horses or oxen. The term used in the act—"cattle"—in its general and primary sense includes sheep. The term is also often used in common parlance, in the United States, in a narrower sense, to signify only animals of the bovine genus. This being so, the court must construe the act, and declare in what sense the term is used therein; and, in so doing, it is not justified in restricting the language used to any particular class of animals comprehended in the general term cattle, because the act is a penal one.

In U. S. v. Winn, supra, Mr. Justice Story says: "But when the words are general, and include various classes of persons, I know of no authority which would justify the court in restricting them to one class, or in giving them the narrowest interpretation, when the mischief which is to be redressed by the statute is equally applicable to all of them. And where a word is used in a statute, which has various known significations, I know of no rule that requires the court to adopt one in preference to another, simply because it is more restrained, if the objects of the statute equally apply to the largest and broadest sense of the word. In short, it appears to me that the proper course in all these cases is, to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature."

Bearing in mind the rule that the language of the act and the mischief to be remedied by it, must both be considered in ascertaining "the true intent of the legislature," I have no hesitation in coming to the conclusion that the word "cattle," as used in the Indian intercourse act of 1834, includes, and was intended to include sheep, as well as cows and oxen.

The demurrer is overruled.

## Case No. 15,745.

UNITED STATES v. MAUK.

[See Case No. 15,715a.]

## Case No. 15,746.

UNITED STATES v. MAUNIER.

[1 Hughes, 412;[1] Mart. N. C. 79.]

Circuit Court, D. North Carolina. 1792.

CRIMINAL LAW—EVIDENCE—EXAMINATION IN WRITING—INDICTMENT.

1. An examination of a prisoner, made before his commitment, under impressions of fear, whether signed or not by him, cannot be read in evidence against him on his trial under indictment for murder on the high seas.

2. An indictment for murder on the high seas need not state the length and depth of the wound which caused the death.

Indictment for murder on the high seas.

Before PATERSON, Circuit Justice, and SITGREAVES, District Judge.

Mr. Attorney of the United States Hill offered to give in evidence the examination of the prisoner before his commitment.

Mr. Martin, for the prisoner, objected to this: 1st. Because the prisoner at the time of his examination was under impressions of fear. 2d. Because the examination was not subscribed by the prisoner.

1. The prisoner was a French sailor, and the murder with which he stood charged had been committed upon the high seas. On his landing in North Carolina he was taken up and committed to jail. From thence he was taken on the next day, brought into court in irons, and examined, without being informed that he was then under an examination and not on his trial. He understood not the English language, and no one informed him of what was passing. There was room to believe that he thought, when he was remanded to jail, that he had been tried, convicted, and condemned, for he asked a person who understood the French language on what day he was to be executed. The counsel said although in the case of a person who had resided some time in this country, or in others in which the proceedings are carried on by jury, the objection would be frivolous, yet it must have weight in the case of a foreigner unacquainted with our laws and our language; that what the prisoner had seen in court, except perhaps the confrontation of witnesses, was all that in familiar circumstances he would have seen in his own country had he been tried there, where sentence of death is not pronounced in court in presence of the

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]